UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

ROBERT TURNER                   )       CASE NO.  1:11CV1210

                           )

           Plaintiff        )       MAGISTRATE JUDGE

                           )       GEORGE J. LIMBERT

       v.                 )

                           )       **MEMORANDUM AND OPINION**

COMMISSIONER OF SOCIAL      )

SECURITY ADMINISTRATION    )

                           )

                           )

           Defendant.     )

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Robert Turner Disability Insurance Benefits (DIB) .  The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his March 15, 2010 decision in finding that Plaintiff was not disabled because there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed (Tr. 10-18).   The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

## I.  PROCEDURAL HISTORY

Plaintiff, Robert Turner, filed his application for DIB  on July 15, 2008, alleging he became disabled on August 13, 2007 (Tr. 90).  However, Plaintiff was last insured for benefits on December 31, 2009 (Tr. 15, 17).  Hence, the relevant time period is from August 13, 2007 to December 31, 2009 (SSR 83-10).  Plaintiff's application was denied initially and on reconsideration, and Plaintiff,

thereafter, requested a hearing before an ALJ (Tr. 87).  On February 8, 2010, a  hearing was held where Plaintiff appeared with counsel and testified before an ALJ, as did Paula C. Day, a vocational expert (Tr. 58-75).

On March 15, 2010, the ALJ issued his decision, finding Plaintiff not to be disabled (Tr. 12-29).  Plaintiff requested a review before the Appeals Council, and the Appeals Council denied Plaintiff's request for review (Tr. 1-6).  Therefore, Plaintiff has requested judicial review of the Commissioner's final decision pursuant to 42 U.S.C. Section 405(g).

## II.  STATEMENT OF FACTS

Robert Turner was born on March 6, 1963 (Tr. 23).  He was forty-four years of age at the time of his alleged onset of disability and forty-six years old at the time of the hearing.  Plaintiff obtained a high school education (Tr. 62).  Plaintiff worked in the past as a wire harness builder, metal laborer, injection molding laborer, lawn maintenance laborer, and vacuum finishing laborer (Tr. 71-72).

## III.  SUMMARY OF MEDICAL EVIDENCE

Plaintiff was first evaluated on March 2, 2006 for venous insufficiency and severe varicose veins.  A March 3, 2006 Doppler ultrasound revealed incompetence in the superficial femoral vein and the greater saphenous vein, and severe saphenovenous reflux at the saphenofemoral junction bilaterally (Tr. 207, 209).  On April 25, 2006, Plaintiff was again evaluated for complaints of bilateral leg pain, left greater than right for nearly two years (Tr. 205).  Upon examination, Plaintiff was noted to have enlarged varicosity in the right mild thigh, with a predominance of all varicosities just below the knees bilaterally, extensive varicosities without ulceration, and hyperpigmentation changes.  Id.

2

He was diagnosed with extensive, symptomatic varicosities, and prescribed compression stockings as treatment (Tr. 206).

Plaintiff underwent surgery to correct the varicose veins of the left leg; specifically, he had a left leg high ligation of the greater saphenous vein, stripping of the greater saphenous vein, varicosity excision greater than forty and excision of two venous lakes (Tr. 207).

On September 6, 2007, Plaintiff was seen at University Primary Care for complaints of a lump on his upper right thigh and pain in his legs (right greater than left) resulting from his varicose veins (Tr. 230). Examination revealed a three centimeter bulge on the inner thigh (the saphenous vein) with multiple varicosities of the right lower leg with discoloration consistent with extravasation and iron deposition. Id. He was noted to require a referral to a vascular surgeon for vein stripping "soon." Id.

On July 14, 2008, Plaintiff again reported complaints of leg pain, this time worse in his right leg (Tr. 218). He was again diagnosed with varicose veins, and was referred to a vascular surgeon (Tr. 219). Another document shows that Plaintiff required twelve visits with a cardiologist from January 1, 2008 through January 1, 2009 (Tr. 221).

On July 28, 2008, Dr. Cerimele (also with University Primary Care) completed a basic medical form for Ohio Department of Job and Family Services (Tr. 231-233). Therein, Dr. Cerimele noted that Plaintiff was diagnosed with varicose veins – severe – and depression – moderate (Tr. 231). He was in need of surgery for the varicose veins (stripping) to decrease swelling and pain. Id. Dr. Cerimele restricted Plaintiff to standing and walking no more than two to three hours per day, no more than one-half hour at a time, sitting three to four hours a day, no more than one-half hour at a time. The Doctor also noted marked limitations in repetitive foot movements, and found Plaintiff was unemployable until after surgery (Tr. 232). The physical findings to support these restrictions

3

included bilateral lower extremity varicosities with obvious swelling of the ankles, calves, and thigh, tenderness, and skin discoloration.  Id.  Finally, Dr. Cerimele reported that Plaintiff suffers from chronic pain secondary to the severe varicose veins and venous stasis of the bilateral lower extremities (Tr. 233).

On September 10, 2008, Plaintiff was evaluated in a consultative examination at the request of the Social Security Administration, by Dr. A. Gerblich (Tr. 262-268).  On examination, he was found to have severe varicosities, more on the right than the left, and was diagnosed with varicose veins (Tr. 263).

On November 12, 2008, a Social Security Administration reviewing physician issued a physical residual capacity statement, limiting Plaintiff to medium lifting, standing/walking no more than two hours of an eight-hour day, with limitations in pushing/pulling with the lower extremities, only occasional climbing of ladders/ropes/scaffolds, and crouching (Tr. 273-274).  At the end of the report, Dr. Cindi Hill wrote that varicose veins could cause some pain and could be worse with any type of activity that compressed Plaintiff's veins (crouching), straining (impedes venous return, such as lifting/climbing), or involved his legs/feet being dependent (standing/walking/sitting/climbing/foot controls).

On January 18, 2009, Plaintiff was seen in the emergency room with complaints of severe pain secondary to varicose veins of the right lower extremity (Tr. 284).  He was given doses of Stadol and Toradol in the emergency department, and was discharged with prescriptions for both Ultram and Darvocet.  Id.

One June 3, 2009, Dr. Tamara Gutierrez, who practices at Orwell Medical Center, completed an updated physical capacity assessment for Plaintiff (Tr. 297-298).  Dr. Gutierrez limited Plaintiff to lifting and carrying twenty pounds occasionally, ten pounds frequently, standing and walking two

4

to three hours a day, less than one hour at a time, sitting two to three hours a day, no more than forty minutes at a time, rarely balancing, crouching, kneeling, or crawling, only occasionally climbing, should avoid heights and temperature extremes, requires breaks in addition to those normally scheduled, every thirty to sixty minutes to elevate his legs, requires an at-will sit/stand option and the ability to lay down, and experiences severe pain.  Id.  Dr. Gutierrez noted that the medical findings which support her assessment include increased swelling and pain in the varicosities, pressure on back of the legs with an increase in swelling and a decrease in blood flow return, with eventual give out and falling when pain becomes severe (Tr. 297).  Dr. Gutierrez performed a physical examination of Plaintiff on the same day, which revealed very tender and severe  varicosities of the legs bilaterally (right greater than left) with complaints of difficulty sleeping due to pain, the left foot turning blue, and inability to use support stockings due to increased pain (Tr. 299).

On June 11, 2010, Dr. Gutierrez completed another physical assessment of Plaintiff (Tr. 312-313).  At this time, Dr. Gutierrez increased Plaintiff's restrictions.  She noted that he was limited to lifting and carrying ten pounds occasionally, five pounds frequently (due to his increased us of a cane for stabilization), standing and walking one-half to one hour a day, no more than fifteen minutes at a time (due to very unsteady walking, with increased swelling and pain, and the need for a cane or walker with ambulation), sitting four hours a day, no more than thirty minutes at a time due to veins swelling and stiffness in his legs, with the need to stand up or lie down, rare or no climbing, balancing, stooping, crouching, kneeling, or crawling, only occasional reaching and handling, with rare or no pushing and pulling (due to poor balance, limited positional tolerance, swelling, and neuropathy), should avoid heights, moving machinery, and temperature extremes, requires breaks in addition to those normally scheduled, requires an at-will sit/stand option, and experiences severe pain. Id.

5

In addition to physical restrictions, Plaintiff alleges that he suffers from depressive disorder with psychotic features, alcohol abuse, and borderline intellectual functioning (Tr. 242).  On January 30, 2006, he underwent testing at the Bureau of Vocational Rehabilitation, which revealed a full scale IQ score of seventy-seven, performance IQ of seventy-eight, and verbal IQ of seventy-four (Tr. 199).

On July 24, 2008, his treating physician, Dr. Cerimele, reported psychiatric findings that included a depressed mood, blunted affect, difficulty sleeping, increased guilt, and decreased interest (Tr. 231).  She diagnosed him with moderate depression.  Id.

On September 6, 2008, Plaintiff underwent a psychological consultative examination, at the request of the Social Security Administration (Tr. 237).  On examination, he reported being depressed and having difficulty sleeping.  Evaluation revealed moderate anxiousness and some paranoid ideation with a history of auditory hallucinations (Tr. 240-242).  The Plaintiff was assigned a global assessment of functioning score of forty, and was found to be limited in withstanding the stress and pressure of routine work (Tr. 242).

Finally, on June 11, 2010, in an assessment of Plaintiff's physical capacity, his then treating physician, Dr. Gutierrez, noted that he has "limited cognitive capacity, needs direction" (Tr. 313).

## IV.    SUMMARY OF TESTIMONY

At the hearing held on February 8, 2010, Plaintiff testified that he uses a cane and a walker to ambulate (Tr. 63).  He also testified that he used to wear compression stockings for his legs, but that it hurts more with them on than with them off (Tr. 62).

With regard to having surgery on the right leg, Plaintiff testified that he has no medical coverage, and that his surgeon, Dr. Schmitter, will not perform the surgery on his right leg until he pays off the cost of the surgery performed in 2006 on his left leg (Tr. 66).

6

With regard to pain, Plaintiff testified that he was prescribed Darvocet, but that it did not help with the pain in his legs, and he is no longer taking it (Tr. 70).  He also testified that elevating his legs as much as possible was recommended by Dr. Gutierrez (Tr. 71).

Upon examination by the ALJ, the vocational expert considered the Plaintiff's age, education, and work background, capable of performing light work, provided the work would not require more than two hours standing and walking in an eight-hour workday. The work would also not require the performance of more than occasional postural activities, nor the performance of more than simple routine one- and two-step activities as a result of moderate limitations in concentration, persistence, and/or pace (Tr. 72).

The vocational expert responded that such an individual could perform sedentary jobs that would accommodate the limitations, such as food and beverage worker, with approximately 5,500 jobs available in Ohio, and 275,000 similar jobs nationally.  Newspaper cutter paster, with approximately 3,000 jobs in Ohio, and 100,000 jobs nationally.  The third example is an addresser, with approximately 3,000 jobs in Ohio, and 100,000 jobs nationally (Tr. 72-73).


## V.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits.  These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. 404.1520© and 416.920(C)(1992);

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* 20 C.F.R. 404.1509

7

and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. 404.1520(d)  and 416.920(d) (1992);

4.     If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e) and 416.920(e) (1992);

5.     If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f) and  416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity.  *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).


**VI.     STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by Section  205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. Section 405(g).  Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards.  *See, Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990).  The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so

long as substantial evidence supports the ALJ's conclusion.  *See, Walters v. Commissioner of Social Security,* 127 F.3d 525., 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla of evidence, but less than a preponderance.  *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971).  It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion.  *See, id., Walters,* 127 F.3d 525, 532 (6th Cir. 1997).  Substantiality is based upon the record taken as a whole. *See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).

### VII.    ANALYSIS

The Plaintiff raises two issues:

1.  Whether the Administrative Law Judge failed to give appropriate weight to the opinion of Plaintiff's treating physicians.

2.  Whether the Administrative Law Judge properly assessed pain as a severe and debilitating impairment.

In this case, substantial evidence supports the conclusion that Plaintiff was capable of performing the sedentary work identified by the vocational expert as consistent with the ALJ's Residual Functional Capacity (RFC) finding.  Plaintiff had essentially no treatment during the relevant two years under consideration.  Rather, during this time, he was advised by every doctor of record (Drs. Cerimele, Lewis, and Gutierrez) to consult with a vascular surgeon about having surgery to remove the varicose veins from his right leg (Tr. 22, 219, 230-31, 298).  The primary care physicians Plaintiff saw, Drs. Cerimele and Gutierrez, advised Plaintiff that having the surgery would allow him to work again (Tr. 231, 298).  Plaintiff understood the significant improvement that would result from recommended surgery, and he advised Dr. Cerimele that removing the veins would allow him to work again (Tr. 229).  Nevertheless, Plaintiff did not see a vascular surgeon during the relevant two years

9

under consideration (Tr. 22-23).

While Plaintiff testified that he had no medical coverage and had no means to pay for the surgery, his claims are not supported by any evidence.  He never reported an inability to pay for the procedure to any physician of record (Tr. 218-19, 229-30, 262-63, 300).

Furthermore, in addition to his lack of treatment during the relevant time frame, Plaintiff's daily living activities do not support his disability allegations.  Plaintiff was alone at home during the time as his fiancé worked (Tr. 62).  In contradiction with his allegations that he could only sit for a half hour at a time, he testified that, while sitting, he would put model cars together for four to five hours a day (Tr. 68).  Indeed, the record shows he had over three hundred such model cars (Tr. 241).  He never indicated he needed to elevate his legs while making all of these model cars.  Also challenging Plaintiff's credibility is his testimony that he did not do anything else during the day (Tr. 70).  However, he made a statement to the consultative examiner that he and his fiancé raised pigs for their own use, and that he wanted to raise a cow the following year (Tr. 241).  Being able to perform these daily activities shows that Plaintiff could perform at least the sedentary work.

Instead of addressing the above-noted facts, Plaintiff argues that the ALJ did not give appropriate weight the opinions of his "treating" physicians, and did not appropriately consider other relevant objective evidence (Plaintiff's Brief at 10-13).  However, Dr. Cerimele (Plaintiff's treating physician) saw Plaintiff on only two occasions during the relevant period, once in September 2007, and once ten months later, in July 2008 (Tr. 229-30).  Dr. Cerimele offered Plaintiff no treatment on either occasion (Tr. 229-30).

As the ALJ also recognized, Dr. Gutierrez saw Plaintiff for one examination, in June 2009 (Tr. 21).  A single documented clinical examination does not suggest the sort of ongoing treatment relationship that would provide Dr. Gutierrez with a superior perspective of Plaintiff's condition.  *See*

10

20 C.F.R. Section 404.1502.  The sole purpose of Dr. Gutierrez's opinions was to support Plaintiff's disability application (Tr. 299).  *See* 20 C.F.R. Section 404.1502 (medical source not considered treating source if relationship is based solely on claimant's need for report in support of his disability claim).  In addition, neither doctor had expertise with treating vascular issues.  *See* 20 C.F.R. Section 404.1527(d)(5).  Both doctors' opinions are based on Plaintiff's subjective complaints, which cannot be a basis for disability finding.  *See* 20 C.F.R. Section 404.1529(a) (Tr. 229-32, 297-99).  Thus, the ALJ concluded that the objective record evidence does not support either doctors' standing, walking, or sitting limitations, nor Dr. Gutierrez's limitation for elevating Plaintiff's legs (Tr. 21).  Other than the presence of varicosities, Plaintiff's clinical examination findings were normal: normal strength, normal range of motion (Tr. 22, 263-67).  However, instead of addressing these normal clinical examination findings during the relevant period, Plaintiff refers to diagnostic findings and an operative report originating from over a year and a half before he alleged he was disabled (Plaintiff's Brief at 12).  Plaintiff argues that these findings support the opinions of Drs. Cerimele and Gutierrez, but neither doctor referenced these findings in support of their conclusions.

Thereafter, Plaintiff argues that while Plaintiff testified that his cane and walker were <u>not</u> prescribed (Tr. 63), the evidence shows otherwise.  However, the record does not show that the cane was prescribed.  In fact, the record contains no prescription for either a cane or walker (Tr. 218-21, 229-30, 299).  Plaintiff cites to Dr. Gutierrez's June 2010 assessment that Plaintiff had a cane/walker at home (Tr. 313), an assessment rendered over six months after the relevant period (Plaintiff's Brief at 12).  Nevertheless, a report that Plaintiff had a cane/walker cannot refute the lack of evidence to show that it was never prescribed during the relevant time period, particularly since Plaintiff testified that it was <u>not</u> prescribed.

11

The undersigned believes that the ALJ correctly considered Plaintiff's allegations of pain, and correctly concluded that he did not have pain to the extent alleged (Tr. 20-23).  As the ALJ concluded his pain and RFC analysis, he correctly determined that Plaintiff has some limitations in his standing and walking due to his varicose veins, however, his treatment history and medical records do not support further restrictions (Tr. 23).  Hence, the ALJ limited Plaintiff to no more than two hours of standing/walking in an eight-hour day with only occasional postural activities (Tr. 23).  Said assessment was supported by the state agency reviewing physician's assessment (Tr. 21, 273-79).  In response to the ALJ's restrictions, the vocational expert identified over 475,000 sedentary jobs in the national economy that a person with Plaintiff's vocational characteristics and RFC could perform (Tr. 24).

**VIII.**   **CONCLUSION**

Based upon a review of the  record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform jobs that existed in substantial numbers in the economy, and, therefore, was not disabled.  Hence, he is not entitled to DIB.

Dated: May 25, 2012                                  _____*/s/George J. Limbert*_____
                                                     GEORGE J. LIMBERT
                                                     UNITED STATES MAGISTRATE JUDGE